Filed 4/11/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CATHERINE A. BOLING et al., | D069626 |
| Petitioners, | |
| v. | |
| PUBLIC EMPLOYMENT RELATIONS BOARD, | |
| Respondent; | |
| CITY OF SAN DIEGO et al., | |
| Real Parties in Interest. | |
| CITY OF SAN DIEGO, | D069630 |
| Petitioner, | |
| v. | |
| PUBLIC EMPLOYMENT RELATIONS BOARD, | |
| Respondent; | |
| SAN DIEGO MUNICIPAL EMPLOYEES ASSOCIATION et al., | |
| Real Parties in Interest. | |

Petition for extraordinary relief from a decision of the Public Employment Relations Board. Decision annulled.

Lounsbery Ferguson Altona & Peak, Kenneth H. Lounsbery, James P. Lough and Alena Shamos for Petitioners and Real Parties in Interest Catherine A. Boling, T. J. Zane and Stephen B. Williams in No. D069626 and No. D069630.

Jan I. Goldsmith and Mara Elliott, City Attorneys, Daniel F. Bamberg, Assistant City Attorney, Walter C. Chung and M. Travis Phelps, Deputy City Attorneys, for Petitioner and Real Party in Interest City of San Diego in No. D069630 and No. D069626.

JONES DAY, Gregory G. Katsas, G. Ryan Snyder, Karen P. Hewitt and Brian L. Hazen for San Diego Taxpayers Education Foundation as Amicus Curiae on behalf of Petitioner in No. D069630.

Renne Sloan Holtzman Sakai and Arthur A. Hartinger for League of California Cities as Amicus Curiae on behalf of Petitioner in No. D069630.

Meriem L. Hubbard and Harold E. Johnson for Pacific Legal Foundation, Howard Jarvis Taxpayers Association and National Tax Limitation Committee as Amici Curiae on behalf of Petitioner in No. D069630.

J. Felix de la Torre, Wendi L. Ross, Mary Weiss, and Joseph W. Eckhart for Respondent.

Smith, Steiner, Vanderpool & Wax and Ann M. Smith for Real Party in Interest San Diego Municipal Employees Association in No. D069626.

Smith, Steiner, Vanderpool & Wax and Fern M. Steiner for Real Party in Interest San Diego City Firefighters Local 145 in No. D069626.

Rothner, Segall and Greenstone, Ellen Greenstone and Connie Hsiao for Real Party in Interest AFCSME Local 127 in No. D069626.

Law Offices of James J. Cunningham and James J. Cunningham for Real Party in Interest Deputy City Attorneys Association of San Diego in No. D069626.

In June 2012 the voters of City of San Diego (City) approved a citizen-sponsored initiative, the "Citizens Pension Reform Initiative" (hereafter, CPRI), which adopted a charter amendment mandating changes in the pension plan for certain employees of City of San Diego (City). In the proceedings below, the Public Employment Relations Board (PERB) determined City was obliged to "meet and confer" pursuant to the provisions of the Meyers-Milias-Brown Act (MMBA) (Gov. Code,[1] § 3500 et seq.) over the CPRI before placing it on the ballot and further determined that, because City violated this purported obligation, PERB could order "make whole" remedies that de facto compelled City to disregard the CPRI.

We conclude, for the reasons stated below, that under relevant California law the meet-and-confer obligations under the MMBA have no application when a proposed charter amendment is placed on the ballot by citizen proponents through the initiative process, but instead apply only to proposed charter amendments placed on the ballot by the governing body of a charter city. We also conclude that, although it is undisputed

---

[1]     All statutory references are to the Government Code unless otherwise specified.

3

that Jerry Sanders (City's Mayor during the relevant period) and others in City's government provided support to the proponents to develop and campaign for the CPRI, PERB erred when it applied agency principles to transform the CPRI from a citizen-sponsored initiative, for which no meet-and-confer obligations exist, into a governing-body-sponsored ballot proposal within the ambit of *People ex rel. Seal Beach Police Officers Assn. v City of Seal Beach* (1984) 36 Cal.3d 591 (*Seal Beach*). Accordingly, we hold PERB erred when it concluded City was required to satisfy the concomitant "meet-and-confer" obligations imposed by *Seal Beach* for governing-body-sponsored charter amendment ballot proposals, and therefore PERB erred when it found Sanders and the San Diego City Council (City Council) committed an unfair labor practice by declining to meet and confer over the CPRI before placing it on the ballot.

I

OVERVIEW

The San Diego Municipal Employees Association and other unions representing the prospectively affected employees (Unions) made repeated demands on Sanders and the City Council for City to meet and confer pursuant to the MMBA over the CPRI before placing it on the ballot. (*San Diego Municipal Employees Assn. v. Superior Court* (2012) 206 Cal.App.4th 1447, 1451-1452 (*San Diego Municipal Employees*).) However, there was no dispute the proponents of the CPRI had gathered sufficient signatures to qualify the CPRI for the ballot, and the City Council declined Unions' meet-and-confer

4

demands and placed it on the ballot. (*Id*. at pp. 1452-1453.) The citizens of San Diego ultimately voted to approve the CPRI.

Unions filed unfair practice claims with the Public Employment Relations Board (PERB), asserting the rejection by Sanders and the City Council of their meet-and-confer demands constituted an unfair practice under the MMBA. PERB commenced proceedings against City and ultimately ruled City violated the MMBA by refusing to meet and confer over the CPRI before placing it on the June 2012 ballot. PERB ordered, among other remedies, that City in effect refuse to comply with the CPRI. City filed this petition for extraordinary review challenging PERB's conclusion that, because high level officials and other individuals within City's government publicly and privately supported the campaign to adopt the citizen-sponsored charter amendment embodied in the CPRI, City committed an unfair labor practice under the MMBA by placing the CPRI on the ballot without complying with the MMBA's meet-and-confer requirements.

In *Seal Beach, supra,* 36 Cal.3d 591, our high court was required to harmonize the provisions of the meet-and-confer requirements of the MMBA with the constitutional grant of power to a "governing body" to place a charter amendment on the ballot that would impact the terms and conditions of employment for employees of that city. The *Seal Beach* court concluded that, before a *governing body* may place such a charter amendment on the ballot, it must first comply with the meet-and-confer obligations under the MMBA. (*Seal Beach,* at pp. 597-601.) The *Seal Beach* court cautioned, however, that the case before it "[did] not involve the question whether the meet-and-confer

5

requirement was intended to apply to charter amendments proposed by initiative." (*Id.* at p. 599, fn. 8.)

The present proceeding requires that we first determine the issue left open in *Seal Beach*: does the meet-and-confer requirement apply when the charter amendment is proposed by a citizen-sponsored initiative rather than a governing-body-sponsored ballot proposal? We conclude the meet-and-confer obligations under the MMBA apply only to a proposed charter amendment placed on the ballot by the governing body of a charter city, but has no application when such proposed charter amendment is placed on the ballot by citizen proponents through the initiative process. With that predicate determination, we must then decide whether PERB properly concluded City nevertheless violated its meet-and-confer obligations because the CPRI was *not* a citizen-sponsored initiative outside of *Seal Beach's* holding, but was instead a "City"-sponsored ballot proposal within the ambit of *Seal Beach*. Although several people occupying elected and nonelected positions in City's government did provide support for the CPRI, we conclude PERB erred when it applied agency principles to transform the CPRI into a governing-body-sponsored ballot proposal. Because we conclude that, notwithstanding the support given to the CPRI by Sanders and others, there is no evidence the CPRI was ever approved by City's governing body (the City Council), we hold PERB erred when it concluded City was required to satisfy the concomitant "meet-and-confer" obligations imposed by *Seal Beach* for governing-body-sponsored charter amendment ballot proposals.

6

II

FACTUAL AND PROCEDURAL BACKGROUND

A.    DeMaio's Pension Reform Proposal

In early November 2010, City Councilmember Carl DeMaio announced his comprehensive plan to reform the City's finances. His wide-ranging plan to reform the City's finances included, among its many proposals, a proposal to replace defined benefit pensions with 401(k)-style plans for newly hired employees.

B.    Sanders's Pension Reform Proposal

In late November 2010, Sanders also announced that he would attempt to develop and place a citizen's initiative on the ballot to eliminate traditional pensions for new hires at City and to replace them with a 401(k)-style plan for nonsafety new hires. Sanders believed replacing the old system with the new 401(k)-style plan was necessary to solve what he viewed to be the unsustainable cost to City of the defined benefit pension for City employees.

Sanders, after discussions with various members of his staff, decided to pursue his pension reform proposal as a citizens' initiative, rather than to pursue it by a City Council-sponsored ballot measure. Sanders chose to pursue his pension reform proposal as a citizen-sponsored initiative, rather than a City Council-sponsored ballot proposal, because he did not believe the City Council would put his proposal on the ballot "under any circumstances," and he also believed pursuing a City Council-sponsored ballot

7

proposal (which would also require negotiating with the unions) could require unacceptable compromises to his proposal.[2]

Sanders held a "kick-off" press conference to announce his intent to pursue his pension reform plans through a private initiative. This event, which was held at City Hall and at which Sanders was joined by others,[3] was covered by the local media and included media statements informing the public that "San Diego voters will soon be seeing signature-gatherers for a ballot measure that would end guaranteed pensions for new [C]ity employees."[4] Sanders's office also issued a news release—styled as a "Mayor Jerry Sanders Fact Sheet"—to announce his decision. Faulconer disseminated Sanders's press release by an e-mail stating Sanders and Faulconer "would craft a groundbreaking [pension] reform ballot measure and lead the signature-gathering effort to place the measure before voters," and Sanders sent a similar e-mail announcing he was partnering

---

[2]   Sanders, in a tape-recorded interview with a local magazine, explained he pursued a citizen-sponsored initiative rather than other avenues to achieve his pension reform objectives because: "[W]hen you go out and signature gather and it costs a tremendous amount of money, it takes a tremendous amount of time and effort . . . . But you do that so that you get the ballot initiative on that you actually want. [A]nd that's what we did. Otherwise, we'd have gone through the meet and confer and you don't know what's going to go on at that point . . . ."

[3]   Also in attendance were City Attorney Jan Goldsmith, City Councilmember Kevin Faulconer, and City's Chief Operating Officer Jay Goldstone).

[4]   NBC San Diego news coverage of Sanders's press conference included a photograph of Sanders standing in front of the City seal to make his initiative announcement.

with Faulconer to "craft language and gather signatures" for a ballot initiative to reform public pensions.

Over the ensuing months, Sanders continued developing and publicizing his pension reform proposal, and in early January 2011 a committee was formed (San Diegans for Pension Reform (SDPR)) to raise money to support his proposed initiative. At his January 2011 State of the City address,[5] Sanders vowed to "complete our financial reforms and eliminate our structural budget deficit." He stated he was "proposing a bold step" of "creating a 401(k)-style plan for future employees . . . [to] contain pension costs and restore sanity to a situation confronting every big city" and that, "acting in the public interest, but as private citizens," Sanders announced that he, Faulconer, and the San Diego City Attorney (City Attorney) "will soon bring to voters an initiative to enact a 401(k)-style plan." That same day, Sanders's office issued a press release publicizing his vow "to push forward his ballot initiative" for pension reform.[6]

Sanders believed he had made it clear to the public that he undertook his efforts as a private citizen even though he was identified as "Mayor" when speaking in public about his proposal.

_____

[5]    Article XV, section 265(c) of the City Charter requires the address as a message from the Mayor to the City Council that includes "a statement of the conditions and affairs of the City" and "recommendations on such matters as he or she may deem expedient and proper." Members of Sanders's staff helped write the speech.

[6]    After his speech, Sanders continued his publicity efforts for his proposal, and he was aided in those efforts by individuals who were also members of his staff.

9

C.     DeMaio's Competing Pension Reform Initiative

The plan announced by DeMaio in early November 2010 for pension reform differed in some respects from Sanders's proposal.  For example, DeMaio's proposed plan for a 401(k)-style plan for new hires did not exempt police, firefighters and lifeguards. DeMaio's proposed plan also included a "cap" on pensionable pay.[7]  Two local organizations, the Lincoln Club and the San Diego County Taxpayers Association (SDCTA), supported DeMaio's competing plan as a plan that was "tougher" than Sanders's proposal.

D.     The CPRI

In the aftermath of Sanders's January 2011 State of the City address, people in the business and development community informed Sanders they believed two competing initiative proposals—the DeMaio proposal and the Sanders proposal—would be

---

[7]     By mid-March 2011, SDPR (the committee formed to support Sanders's proposed plan) hired an attorney to provide advice related to Sanders's proposed plan, and the attorney had opined the "cap" on pensionable pay as proposed by DeMaio's plan would make such a plan more vulnerable to legal challenges.  SDPR also independently hired Buck Consultants, then serving as City's actuary for City's existing pension plan (and therefore with access to the data on City's pension system database), to provide a fiscal analysis of the impacts of 401(k) plans for new employees.  Apparently, during the transition period to a 401(k)-style plan for new employees, there would be an immediate shorter term cost to City (because the change in the actuarial method used in doing the calculation would increase City's payments into the pension plan in the first three or four years), and a proposal for a "hard cap" on total payroll expenses could have mitigated the short-term impacts on City from the pension reform proposal.  At his March 24, 2011, press conference, Sanders (along with Faulconer and the co-chairman for SDPR) reiterated their intent to move forward as private citizens with their pension reform proposal, and stated it would include caps and restrictions (including a five-year cap on City's payroll expenses) to produce greater savings for City.

10

confusing and there would be inadequate money to fund two competing citizen initiatives. Shortly after a March 24, 2011, press conference at which Sanders presented his refined proposal, people within either the Lincoln Club or SDCTA told Sanders they were "moving forward" with DeMaio's plan because it had sufficient money and was going to go onto the ballot, and that Sanders could either join them or go off on his own. This apparently triggered a series of meetings between supporters of the competing proposals,[8] and they reached an accord on the parameters of a single initiative.

The final initiative proposal, which ultimately became the CPRI, melded elements of both Sanders's and DeMaio's proposals: newly hired police would still continue with a defined benefit pension plan for newly-hired police officers, but newly-hired firefighters would be placed into the 401(k)-style plan. The pensionable pay freeze would be subject to the meet-and-confer process and could be overridden by a two-thirds majority of the City Council, but there would be no cap on total payroll. Sanders called the negotiations "difficult," and testified he did not like every part of the new proposal, but he nonetheless supported it because he believed it was "important for the City in the long run."

A law firm (Lounsbery, Ferguson, Altona & Peak (hereafter Lounsbery)) was hired by SDCTA to draft the language of the CPRI. SDCTA gave Lounsbery the DeMaio draft of the initiative as the starting point for Lounsbery's drafting of the final

---

8    Among those who attended one or more of the meetings were Sanders, Goldstone and Dubick (Sanders's chief of staff).

language for the initiative.[9] Lounsbery made relatively few revisions to it to finalize the language that became the CPRI. Lounsbery was paid by SDCTA for its services.[10]

On April 4, 2011, the City Clerk received a notice of intent to circulate a petition seeking to place the CPRI on the ballot, seeking to amend City's Charter pursuant to section 3 of article XI of the California Constitution. The ballot proponents were Catherine A. Boling (Boling), T.J. Zane (Zane), and Stephen Williams (Williams) (collectively, Proponents).[11]

To qualify the CPRI for the ballot, the Proponents needed to obtain verified signatures from at least 15 percent (94,346) of the City's registered voters. On September 30, 2011, Zane delivered to the City Clerk a petition containing over 145,000 signatures, and the City Clerk forwarded the petition to the San Diego County Registrar of Voters (SDROV) to officially verify the signatures. The SDROV determined the initiative

---

[9]     Goldstone testified SDCTA sought his feedback on its proposed language, and he reviewed and responded to two or three drafts in the evening or weekends at his home. Dubick and Goldsmith also reviewed and provided feedback on the proposed language.

[10]     Lounsbery filed a quarterly disclosure form indicating San Diego Taxpayers Association paid $18,000 to Lounsbery for its services in connection with its work on the CPRI for the first quarter of 2011. Among the people listed as being "lobbied" in connection with Lounsbery's work on the CPRI were Sanders, Goldstone, Goldsmith, Dubick and Faulconer.

[11]     Williams and Zane were leaders in the Lincoln Club, and the Lincoln Club (along with SDPR, the committee formed to raise money in support of Sanders's proposed initiative) was a major contributor to the committee formed to promote the campaign for the CPRI. Although Sanders would have preferred that SDPR's head (Shephard) run the campaign, Sanders was persuaded by a vice chairman of the Lincoln Club that Zane was perfectly capable of running the ballot initiative campaign from the Lincoln Club.

petition contained sufficient valid signatures and, accordingly, on November 8, 2011, the SDROV issued a Certification that the CPRI petition had received a "SUFFICIENT" number of valid signatures requiring it to be presented to the voters as a citizens' initiative.  The City Clerk submitted the SDROV's Certification to the City Council on December 5, 2011, and that same day the City Council passed Resolution R-307155, a resolution of intention to place the CPRI on the June 5, 2012, Presidential primary election ballot, as required by law.

E.      Sanders Campaigns for the CPRI

The day after the proponents filed their notice of intent to circulate, Sanders, DeMaio, Goldsmith, Faulconer, Boling, and Zane held a press conference on the City Concourse at which they announced the filing of the CPRI petition.[12]  A news media outlet reported that proponents of the dueling ballot measures to curtail San Diego City pensions had reached a compromise to combine forces behind a single initiative for the June ballot.  Sanders thereafter supported the campaign to gather signatures and promote the CPRI.  He touted its importance by providing interviews and quotes to the media and by discussing it at his speaking appearances[13].  Additionally, campaign disclosure

[12]      Sanders testified he appeared as a private citizen, and assumed the same was true for Goldsmith, although there is no evidence whether they communicated this fact to the press or the public at the press conference.!(XIII:3427-3428)!

[13]      For example, he included the CPRI in the "bullet points" prepared for his speaking engagements before various groups.  He also approved issuing a "message from Mayor Jerry Sanders" for circulation to members of the San Diego Regional Chamber of Commerce that solicited financial and other support for the signature gathering effort, although he did not know whether the language of that message was drafted by the

13

statements indicated SDPR (the committee formed to promote Sanders's original initiative proposal) contributed $89,000 in cash and nonmonetary support to the committee supporting the CPRI from January 1, 2011, through June 1, 2011.

F.      The Meet-and-Confer Demands

On July 15, 2011, the San Diego Municipal Employees Association (MEA) wrote to Sanders asserting City had the obligation under the MMBA to meet and confer over the CPRI.  When Sanders did not respond, MEA wrote a second letter demanding City satisfy its meet-and-confer obligations concerning the CPRI.  City Attorney Goldsmith responded by stating, among other things, the City Council was required (under the California Constitution and state elections law) to place the CPRI without modification on the ballot as long as the proponents submitted the requisite signatures and otherwise met the procedural requirements for a citizen initiative to amend the Charter.  Goldsmith explained that, "[a]ssuming the proponents of the [CPRI] obtain the requisite number of signatures on their petition and meet all other legal requirements, there will be no determination of policy or course of action by the City Council, within the meaning of the MMBA, triggering a duty to meet and confer in the act of placing the citizen initiative on the ballot."

MEA, in its September 9, 2011, response to Goldsmith's explanation, asserted City *was* obligated to meet and confer because Sanders was acting as the Mayor to promote

campaign or by his staff.  Members of Sanders's staff facilitated his promoting of the CPRI by, for example, responding to requests from the media for quotes.

14

the CPRI and hence "has clearly made a determination of policy *for this City* related to mandatory subjects of bargaining . . . ." MEA asserted Sanders was "using the pretense that [the CPRI] is a 'citizens' initiative' when it is, in fact, this *City's* initiative" as a deliberate tactic to "dodge the City's obligations under the MMBA." The City Attorney's office reiterated City had no meet-and-confer obligations "at this point in the process" because "there is no legal basis upon which the City Council can modify the [CPRI], if it qualifies for the ballot," but instead the City Council "must comply with California Elections Code . . . section 9255" and place the CPRI on the ballot if it meets the signature and other procedural requirements set forth in the Elections Code. Accordingly, City declined MEA's demand to meet and confer over the CPRI.[14]

G.     The Initial Proceedings and *San Diego Municipal Employees*

MEA filed its unfair practice charge (UPC) on January 20, 2012, asserting City refused to meet and confer over the CPRI because "City claims that it is a 'citizen's initiative' *not* 'City's initiative,' " and MEA alleged this refusal violated the MMBA because the CPRI "is merely a sham device which City's 'Strong Mayor' has used for the express purpose of avoiding City's MMBA obligations to meet and confer." However, on January 30, 2012, the City Council, after recognizing the petitions for the CPRI contained the requisite number of signatures, enacted an ordinance placing the CPRI on the June 2012 ballot.

_____

[14]     Subsequent demands by MEA (as well as other employee unions) to meet and confer were rejected by City for similar reasons.

15

On February 10, 2012, PERB issued a complaint against City, alleging City's failure to meet and confer violated sections 3505 and 3506, and was an unfair practice within the meaning of section 3509, subdivision (b) and California Code of Regulations, title 8, section 32603, subdivisions (a) through (c).[15]  PERB also ordered an expedited administrative hearing and appointed an administrative law judge (ALJ) to hold an evidentiary hearing on the complaints.  (*San Diego Municipal Employees, supra,* 206 Cal.App.4th at p. 1453.)

PERB also filed a superior court action seeking, among other relief, an order temporarily enjoining presentation of the CPRI to the voters on the June 2012 ballot, but the trial court rejected PERB's motion for a preliminary injunction.  (*San Diego Municipal Employees, supra,* 206 Cal.App.4th at pp. 1453-1454.)  After the ALJ scheduled an administrative hearing for early April 2012 on the complaints, City moved in the superior court action for an order staying the administrative hearing and quashing the subpoenas issued by the ALJ.  The trial court granted City's motion to stay the administrative proceedings, and MEA pursued writ relief.  (*Id*. at pp. 1454-1455.)  In *San Diego Municipal Employees,* this court concluded the stay was improper because "[a]s the expert administrative agency established by the Legislature to administer collective bargaining for covered governmental employees, PERB has exclusive initial jurisdiction over conduct that arguably violates the MMBA" (*id*. at p. 1458), and PERB's "initial

---

15    Other unions also filed UPC's and PERB issued complaints on those claims.  All of the claims and complaints were ultimately consolidated for hearing.

16

exclusive jurisdiction extends to activities ' "*arguably* . . . prohibited" by public employment labor law . . . .' " (*Id*. at p. 1460, quoting *City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 606, italics added by *San Diego Municipal Employees*).) This court noted that, had City directly placed the CPRI on the ballot without satisfying the meet-and-confer procedures, it would have engaged in conduct prohibited by the MMBA, and we ultimately concluded that because "MEA's UPC alleges (and provides some evidence to support the allegations) that the CPRI (while nominally a citizen initiative) was actually placed on the ballot by City using straw men to avoid its MMBA obligations, the UPC does allege City engaged in activity *arguably* prohibited by public employment labor law, giving rise to PERB's initial exclusive jurisdiction." (*Id*. at p. 1460.) This court ultimately concluded it was error to stay PERB's exclusive initial jurisdiction over the UPC claims, and vacated the stay. (*Id*. at pp. 1465-1466.)

H.    PERB Proceedings and Determination

*The ALJ Proposed Decision*

The ALJ held an administrative hearing and, after taking evidence, issued a proposed decision. The proposed decision found Sanders chose to pursue a citizens' initiative measure, rather than invoke the City Council's authority to place his plan on the ballot as a City Council-sponsored ballot proposal, because he doubted the City Council's willingness to agree with him and because he sought to avoid concessions to the unions. The ALJ found the CPRI, which embodied a compromise between Sanders's proposal

17

and the proposal championed by DeMaio, was then carried forward as a citizens' initiative and was adopted by the electorate. The ALJ found that, because Sanders occupied the office of Mayor in a city that uses the "strong mayor" form of governance, and in that role has certain responsibilities when conducting collective bargaining with represented employee organizations on behalf of City (including the responsibility to develop City's initial bargaining proposals, to map out a strategy for negotiations, and to brief the City Council on the proposals and strategies and to obtain the City Council's agreement to proceed), Sanders "was not legally privileged to pursue implementation of [pension reform] as a private citizen." The ALJ concluded that because Sanders, acting "under the color of his elected office" and with the support of two City Councilmembers and the City Attorney,[16] launched and pursued the pension reform initiative campaign, Sanders made "a policy determination that [City] propose[d] for adoption by the electorate" on a negotiable matter but denied the unions "an opportunity to meet and

---

[16] The ALJ's decision also cited evidence that "[q]uantifiable time and resources derived from the City . . . were devoted to the Mayor's promotion of his initiative, notwithstanding the views of some or all of the City's witnesses that their activities were on personal time." However, the ALJ appeared to find that, even if all of the support work done by individual members of Sanders's staff had been "done on non-work time, their defense that these activities were done for private purposes is no stronger than the Mayor's . . . ." We note this finding because the PERB decision, as well as PERB's arguments in this writ proceeding, devotes substantial analysis to explaining that City-owned resources (as well as time spent by individuals who were members of Sanders's staff) were employed to support the CPRI. Although there is some evidentiary support for these factual findings, neither PERB's decision nor PERB's briefs in this proceeding articulates the legal relevance of these findings on the central issue raised in this proceeding—whether Sanders's acts in supporting the CPRI were as agent for the City Council—and we therefore limit our remaining discussion of those facts.

18

confer over his policy determination in the form of [the CPRI]," in violation of the meet-and-confer obligations under *Seal Beach.* The ALJ further concluded that, because of Sanders's "status as a statutorily defined agent of the public agency and common law principles of agency, the same obligation to meet and confer applie[d] to the City because it has ratified the policy decision resulting in the unilateral change."

*The PERB Decision*

After PERB considered supplemental briefing concerning the ALJ's proposed decision from City, Unions and the ballot proponents, PERB issued the decision challenged in this writ proceeding that largely affirmed the ALJ's decision.[17] Specifically, PERB rejected City's exceptions to the ALJ's conclusions that City was charged with Sanders's conduct under principles of statutory agency, common law principles of agency based on actual and apparent authority, and common law ratification principles.[18] Instead, PERB adopted the ALJ's findings that: (1) "under the City's Strong Mayor form of governance and common law principles of agency, Sanders was a

[17] PERB modified the remedies ordered by the ALJ's proposed decision (see fn. 20, *post*) but affirmed the core determination that the refusal to meet and confer over the CPRI before placing it on the ballot violated the MMBA.

[18] Curiously, although PERB concluded common law agency principles permitted PERB to charge City with Sanders's conduct in promoting and campaigning for the CPRI, PERB also concluded the evidence showed the Proponents of the CPRI (who paid to have the CPRI drafted and who ran the signature effort and campaign for passage of the CPRI) were *not* Sanders's agents because they undertook their actions outside of Sanders's control. PERB nevertheless concluded common law principles of ratification and apparent authority applied "so as not to excuse the City's failure to meet and confer based on the actions of private citizens involved in the passage of [the CPRI]."

19

statutory agent of the City with actual authority to speak for and bind the City with respect to initial proposals in collective bargaining with the Unions; (2) under common law principles of agency, [Sanders] acted with actual and apparent authority when publicly announcing and supporting a ballot measure to alter employee pension benefits; and (3) the City Council had knowledge of [Sanders's conduct], by its action and inaction, and, by accepting the benefits of Proposition B, thereby ratified his conduct." PERB's decision also concluded that, because City (through Sanders as its agent) decided to place the CPRI on the ballot while acquiescing in Sanders's rejection of the unions' meet-and-confer demands, City violated the MMBA.[19]

PERB modified the remedy ordered in the ALJ's proposed decision insofar as the proposed decision ordered City to vacate the results of the election adopting the CPRI.[20]

---

[19]     Specifically, PERB found the City Council "was on notice that, even if pursued as a private citizens' initiative, [Sanders's] public support for an initiative to alter employee pension benefits would be attributed to the City for purposes of MMBA. . . . [¶] . . . [¶] After it became aware of the Unions' requests for bargaining, the City Council, like [Sanders], relied on the advice of Goldsmith that no meet-and-confer obligation arose because [the CPRI] was a purely 'private' citizens' initiative. The City Council failed to disavow the conduct of its bargaining representative and may therefore be held responsible for [Sanders's] conduct. [Citation.] The City Council also accepted the benefits of [the CPRI] with prior knowledge of [Sanders's] conduct . . . . [¶] We agree with the ALJ's findings that, with knowledge of his conduct and, in large measure, notice of the potential legal consequences, the City Council acquiesced to [Sanders's] actions, including his repeated rejection of the Unions' requests for bargaining, and that, by accepting the considerable financial benefits resulting from passage and implementation of [the CPRI], the City Council thereby ratified [Sanders's] conduct."

[20]     The ALJ's Proposed Decision required, among other affirmative actions by City, that City "[r]escind the provisions of [the CPRI] adopted by the City and return to the status quo that existed at the time the City refused to meet and confer . . . ." The PERB decision declined to adopt that aspect of the remedy posited in the ALJ's proposed

However, PERB's remedy, invoking its "make-whole" and "restoration" powers for remedying violations of the MMBA, ordered (among other things) that City "pay employees for all lost compensation, including but not limited to the value of lost pension benefits, resulting from the enactment of [the CPRI], offset by the value of new benefits required from the City under [the CPRI]."

*Writ Proceedings Challenging PERB Decision*

City timely filed this writ petition challenging PERB's decision (§ 3509.5), and this court issued its writ of review. In City's writ proceeding, City named Proponents as additional real parties in interest and Proponents have filed briefs in that proceeding. Proponents also filed a separate writ petition challenging PERB's decision, and this court issued a writ of review. We subsequently consolidated the two writ proceedings for consideration and disposition.

In City's writ proceeding, PERB (joined by Unions) has moved to dismiss Proponents as real parties in interest, arguing Proponents lack standing to participate as real parties because they were not (and were indeed barred by PERB regulations from being) parties to the underlying PERB proceeding. PERB has separately moved to dismiss Proponents' writ proceeding on the same ground. We conclude official proponents of a ballot initiative have a sufficiently direct interest in the result of the proceeding (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1178) to join as real parties in interest in an action, either by intervention or because they are named by other

decision because PERB expressed doubts it had the power to rescind an initiative adopted by the voters.

21

parties as real parties in interest, which is directed at the evisceration of the ballot measure for which they were the official proponents. (See *Perry v. Brown* (2011) 52 Cal.4th 1116, 1125; see also *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1250.) Accordingly, we deny PERB's motion to dismiss Proponents as real parties in interest from City's writ proceeding. Additionally, in light of our conclusion that PERB's decision must be annulled because City was not obligated to meet and confer prior to placing the CPRI on the ballot, PERB's motion to dismiss Proponents' writ proceeding (and the additional arguments raised in Proponents' writ proceeding) are moot and we need not address them.

## II

## STANDARDS OF REVIEW

The standards applicable to our review of a PERB decision are governed by differing degrees of deference. First, insofar as PERB's decision rests on its resolution of disputed factual questions, we apply the most deferential standard of review. Under this standard, PERB's factual findings are conclusive as long as there is any substantial evidence in the record to support its factual findings. (*Trustees of Cal. State University v. Public Employment Relations Bd.* (1992) 6 Cal.App.4th 1107, 1123; see, e.g., *Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 618-623 [affirming PERB determination that students were employees under Higher Education Employer-Employee Relations Act because substantial evidence supported

22

conclusion students' educational objectives were subordinate to the services students performed as housestaff].)

The deference to be accorded PERB's resolution of questions of law, and PERB's application of that law to the facts found by PERB, presents a more complicated question, because "balancing the necessary respect for an agency's knowledge, expertise, and constitutional office with the courts' role as interpreter of laws can be a delicate matter . . . ." (*Gonzales v. Oregon* (2006) 546 U.S. 243, 255.) PERB asserts that we must follow its determinations of law unless clearly erroneous. Specifically, PERB argues that because it has been invested by the legislative scheme with the "specialized and focused task" of protecting " 'both employees and the state employer from violations of the organizational and collective bargaining rights guaranteed by [law]' " (*Banning Teachers Assn. v. Public Employment Relations Bd.* (1988) 44 Cal.3d 799, 804), PERB is " 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.' " (*Ibid.*, quoting *Universal Camera Corp. v. National Labor Relations Bd.* (1951) 340 U.S. 474, 488.) Accordingly, PERB argues, "[T]he relationship of a reviewing court to an agency such as PERB, whose primary responsibility is to determine the scope of the statutory duty to bargain and resolve charges of unfair refusal to bargain, is generally one of deference" (*Ibid.,* citing *Oakland Unified School Dist. v. Public Employment Relations Bd.* (1981)

23

120 Cal.App.3d 1007, 1012), and PERB's interpretation will generally be followed unless it is clearly erroneous.

However, in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*), our Supreme Court explained, " 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Id*. at p. 8.) *Yamaha's* conceptual framework noted that courts must distinguish between two classes of interpretive actions by the administrative body—those that are "quasi-legislative" in nature and those that represent interpretations of the applicable law—and cautions that "because of their differing legal sources, [each] command significantly different degrees of deference by the courts." (*Id*. at p. 10.) When examining the former type of action, an agency interpretation "represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Id*. at pp. 10-11.)

However, "[t]he quasi-legislative standard of review 'is *inapplicable* when the agency is not exercising a discretionary rule-making power, but merely *construing* a

24

controlling statute. The appropriate mode of review in such a case is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction.' [(Quoting *International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 931, fn. 7.)]" (*Yamaha, supra*, 19 Cal.4th at p. 12, italics added by *Yamaha*.) *Yamaha* recognized that, unlike quasi-legislative rule making by the agency, an agency's interpretation of the law does not implicate the exercise of a delegated lawmaking power but "instead . . . represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts." (*Id*. at p. 11.) *Yamaha* recognized that an agency may often be interpreting the legal principles within its administrative jurisdiction and, as such "may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . , that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion*, however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference." (*Ibid*.)

We construe *Yamaha* as recognizing that, in our tripartite system of government, it is the judiciary—not the legislative or executive branches—that is charged with the final responsibility to determine questions of law (*Yamaha, supra,* 19 Cal.4th at p. 11 & fn. 4), and "[w]hether judicial deference to an agency's interpretation is appropriate and, if so, its

extent—the 'weight' it should be given—is thus fundamentally *situational*." (*Id*. at p. 12, italics added.) Thus, while *some* deference to an agency's resolution of questions of law may be warranted when the agency possesses a special expertise with the legal and regulatory milieu surrounding the disputed question (see *New Cingular Wireless PCS, LLC v. Public Utilities Commission* (2016) 246 Cal.App.4th 784, 809-810), the judiciary accords no deference to agency determinations on legal questions falling outside the parameters of the agency's peculiar expertise.[21] (See, e.g., *Overstreet ex rel. NLRB v. United Brotherhood of Carpenters and Joiners of America, Local Union No. 1506* (9th Cir. 2005) 409 F.3d 1199, 1208-1209 [no deference accorded to the NLRB's interpretation of NLRA when judged against backdrop of competing constitutional issues]; accord, *California State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 55 [under *Yamaha* "the degree of deference accorded should

---

[21]     Indeed, although a court may accept statutory constructions made by PERB that are "within PERB's legislatively designated field of expertise . . . unless it is clearly erroneous" (*San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 854-856 [because PERB is empowered to determine in disputed cases whether a particular item is within or without the scope of representation requiring bargaining, interpretation of a statutory provision defining scope of representation falls squarely within PERB's legislatively designated field of expertise and will not be reversed unless clearly erroneous]), the courts in other contexts have declined to accord any deference when the PERB decision does not adequately evaluate and apply common law principles. (See, e.g., *Los Angeles Unified School Dist. v. Public Employment Relations Bd.* (1983) 191 Cal.App.3d 551, 556-557 [PERB determined two local public employee unions, both affiliated with same international, were not "same employee organization" within the meaning of section 3545, subdivision (b)(2), because *actual* conduct showed international did not exercise dominion and control over local unions; court reversed PERB ruling and concluded two local unions would qualify as the same employee organization within the meaning of the statute as long as international actually *or potentially* exercised the requisite dominion and control].)

26

be dependent in large part upon whether the agency has a ' "comparative interpretative advantage over the courts" ' and on whether it has probably arrived at the correct interpretation"]; *Azusa Land Partners v. Department of Indus. Relations* (2010) 191 Cal.App.4th 1, 14 [Where dispositive facts are undisputed and purely legal issues remain requiring interpretation of a statute an administrative agency is responsible for enforcing, courts exercise independent judgment, and "agency's interpretation is ' "one of several interpretive tools that may be helpful. In the end, however, '[the court] must . . . independently judge the text of the statute.' " ' "].)

IV

ANALYSIS

A.     Overview of MMBA

The MMBA codifies California's recognition of the right of public employees to collectively bargain with their government employers, and reflects a strong policy in California favoring peaceful resolution of employment disputes by negotiations. (§ 3500; *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 622.) In furtherance of that goal, section 3504.5 of the MMBA requires that reasonable written notice be given to organizations such as the MEA of any action "proposed to be adopted by the governing body" that directly relates to matters within the scope of representation.[22] It further

---

22     Section 3504.5, subdivision (a) provides that, "Except in cases of emergency as provided in this section, the governing body of a public agency . . . shall give reasonable written notice to each recognized employee organization affected of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation

27

requires such governing body or its designated representative, "prior to arriving at a determination of policy or course of action," to "meet-and-confer in good faith" with representatives of the union concerning negotiable subjects.[23]

The duty to meet and confer, which "has been construed as a duty to bargain . . . [citation] [and] . . . requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse" (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 537), thus places on the employer the duties (1) to give reasonable written notice (to each recognized employee organization affected) of an ordinance directly relating to matters within the scope of representation "proposed to be adopted by the governing body" and provide such organization the opportunity to meet with the governing body, and (2) to meet and confer in good faith (and consider fully the presentations by the organization) prior to arriving at any determination on the governing body's course of action. (§§ 3504.5, subd. (a) & 3505.) Accordingly, absent emergency circumstances or other exceptions, a governing body that is subject to the MMBA may not adopt a legislative policy that unilaterally changes its employees' wages and working

proposed to be adopted by the governing body . . . and shall give the recognized employee organization the opportunity to meet with the governing body . . . ."

23     Section 3505 provides: "The governing body of a public agency . . . or other representatives as may be properly designated by law or by such governing body, shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations . . . , and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action."

28

conditions without first complying with its meet-and-confer obligations imposed by the MMBA.

In *Seal Beach*, the court was required to harmonize the provisions of the "meet-and-confer" requirements of the MMBA with the constitutional grant of power to a city council, as governing body for a charter city, to place a charter amendment on the ballot that would (if adopted) impact the terms and conditions of employment for employees of that city. The *Seal Beach* court concluded that, before such a governing body may place this type of charter amendment on the ballot, it must first comply with the meet-and-confer obligations under the MMBA. (*Seal Beach, supra,* 36 Cal.3d at pp. 597-601.) The *Seal Beach* court cautioned, however, that the case before it "[did] not involve the question whether the meet-and-confer requirement was intended to apply to charter amendments proposed by initiative." (*Id*. at p. 599, fn. 8.)

B.      *Seal Beach's* Meet-and-Confer Obligations Do Not Apply to Citizen Initiatives

We first address and resolve the issue expressly left open in *Seal Beach:* whether the meet-and-confer requirements of the MMBA, which *Seal Beach* concluded *did* apply to a city council's determination to place a charter amendment on the ballot, apply with equal force before the governing body of a charter city may comply with its statutory obligation to place on the ballot a duly qualified citizen's initiative proposing the same type of charter amendment.[24]

---

24      We believe it is both necessary and appropriate to resolve this threshold issue. It is necessary because if we were to conclude the same meet-and-confer obligations are compelled, *regardless* of whether persons associated with city government are involved

*Citizens Initiatives Do Not Trigger MMBA Procedural Requirements*

The charter amendment provisions contained in article XI, section 3, subdivision (b), of the California Constitution provide only two avenues by which a charter amendment may be proposed: it "may be proposed by initiative or by the governing body." When an amendment is proposed by *initiative*, and at least 15 percent of the registered voters of the charter city sign the initiative petition, the governing body "*shall . . .* [submit the initiative] to the voters" at an election not less than 88 days after the date of the order of election. (Elec. Code, 9255, subd. (c), italics added.) The "governing body" has no discretion to do anything other than to place a properly qualified initiative on the ballot.[25] (*Farley v. Healey* (1967) 67 Cal.2d 325, 327; *Save Stanislaus Area Farm Economy v. Board of Supervisors* (1993) 13 Cal.App.4th 141, 148 ["local governments have the purely ministerial duty to place duly certified initiatives on the

---

in drafting and/or campaigning for a citizen-sponsored initiative, we would have to affirm PERB's principal determination that City violated the MMBA by refusing unions' demands to meet and confer before placing the CPRI on the ballot, and all of PERB's subsidiary conclusions regarding Sanders's actual or ostensible agency relationship to City (even if legally erroneous) would become superfluous. (Cf. *Reed v. Gallagher* (2016) 248 Cal.App.4th 841, 853 [when decision is correct on any theory applicable to the case, appellate court will affirm the decision regardless of correctness of grounds relied on below to reach conclusion].) We believe resolution of the question left open in *Seal Beach* is also appropriate because it provides some illumination for our analysis of whether City violated its MMBA obligations when it placed the CPRI on the ballot without first meeting and conferring with the unions.

25     The governing body arguably has some flexibility as to at which election the initiative is presented to the voters (*Jeffrey v. Superior Court* (2002) 102 Cal.App.4th 1, 4-10), but PERB cites no authority that such flexibility would have permitted the City Council to refuse to place the CPRI on a ballot without modification in contravention of the mandatory language contained in Elections Code section 9255.

ballot"].)  Because "[p]rocedural requirements which govern *council* action . . . generally do not apply to initiatives" (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 594), the courts have repeatedly noted "it is well established . . . that the existence of procedural requirements for the adoptions of local ordinances generally does not imply a restriction of the power of [a citizen-sponsored] initiative . . . ." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 785; accord, *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 823-824 [procedural requirements of § 65863.6, which must be met before local agency adopts no-growth ordinance, inapplicable to voter-sponsored initiative adopting no-growth ordinance].)

In contrast, when a governing body of a city votes to adopt a proposal for submission to its voters, such action *is* a discretionary rather than ministerial determination by the governing body.  (See, e.g., *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 187 (*Friends of Sierra Madre*).)  Because of the "clear distinction between voter-sponsored and city-council-generated initiatives" (*id*. at p. 189), the courts have repeatedly concluded the same procedural limitations that would otherwise apply to the same discretionary determination by a governing body will apply to a city council-generated ballot proposal.  Thus, in *Friends of Sierra Madre,* the court held that the procedural mandates of CEQA were required for a ballot measure, generated by a city council in exercise of its discretion, which would remove certain structures from protection as historic landmarks.  While similar *citizen-sponsored* measures do not require compliance with analogous regulatory procedural prerequisites (see, e.g., *Stein v.*

*City of Santa Monica* (1980) 110 Cal.App.3d 458, 460-461; cf. *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1035-1037), *Friends of Sierra Madre* concluded a *city council*-sponsored ballot proposal for a discretionary project could not evade compliance with CEQA. (*Friends of Sierra Madre,* at pp. 186-191.)

In this setting, *Seal Beach* concluded the procedural requirements of the MMBA *did* apply to a city council-sponsored ballot proposal amending the charter as to matters concerning the terms and conditions of public employment. The court reasoned the meet-and-confer requirements, imposed on public agencies as procedural requirements a public agency must satisfy before adopting its final budget for the ensuing year (*Seal Beach, supra*, 36 Cal.3d at pp. 596-597), were procedural requirements that could coexist with the constitutional power of a city council to propose a substantive charter amendment. (*Id*. at p. 600, fn. 11 [noting "there is a clear distinction between the *substance* of a public employee labor issue and the *procedure* by which it is resolved" and acknowledging that although salaries of local employees of a charter city constitute municipal affairs not subject to general laws, the *process* by which salaries are fixed is matter of statewide concern].) *Seal Beach* noted that "[a]lthough [section 3505] encourages binding agreements resulting from the parties' bargaining, the governing body of the agency—here the city council—retains the ultimate power to refuse an agreement and to make its own decision. [Citation.] This power preserves the council's rights under article XI, section 3, subdivision (b)—it may still propose a charter amendment if the meet-and-

32

confer process does not persuade it otherwise. [¶] We therefore conclude that the meet-and-confer requirement of section 3505 is compatible with the city council's constitutional power to propose charter amendments." (*Id*. at p. 601, fn. omitted.)

The core tenets of *Seal Beach* were that (1) the MMBA was clearly intended to apply to regulate actions by the governing bodies of charter cities and (2) the MMBA mandates that those governing bodies satisfy the procedural prerequisites (the meet-and-confer process) before unilaterally imposing any changes to the matters within the scope of representation. (*Seal Beach, supra,* 36 Cal.3d at pp. 596-597.) From those tenets, *Seal Beach* concluded a governing body constrained by the procedural requirements of the MMBA cannot circumvent the meet-and-confer requirement by using a charter amendment to unilaterally implement the same changes that would otherwise be subjected to the meet-and-confer requirement. (*Id*. at p. 602.)[26]

In contrast, the courts have refused to subject citizen-sponsored initiatives to the same procedural constraints that would apply if the same subject matter were embodied in a city council-sponsored ballot proposal (compare *Stein v. City of Santa Monica,*

_____

[26]    Indeed, *Seal Beach* specifically noted that "[t]he logical consequence of the city's position is, actually, that the MMBA cannot be applied to charter cities at all. If a meet-and-confer session with the city council concerning contemplated charter amendments impinges on the council's constitutional power, what of salary ordinances? It is 'firmly established that the mode and manner of passing ordinances is a municipal affair . . . and that there can be no implied limitations upon charter powers concerning municipal affairs.' [(Quoting *Adler v. City Council* (1960) 184 Cal.App.2d 763, 776-777.)] If meeting and conferring on charter amendments is an illegal limitations [sic] on the city council's power, why is the same not true of any ordinance which affects 'terms and conditions of public employment?' " (*Id*. at p. 602, fn. 12.)

*supra,* 110 Cal.App.3d at pp. 460-461 with *Friends of Sierra Madre, supra,* 25 Cal.4th at pp. 186-191), which militates in favor of a conclusion that the procedural meet-and-confer obligation cannot be superimposed on a citizen-sponsored initiative addressing matters within the "scope of representation" as that term is used in the MMBA. (Accord, *Native American Sacred Site & Environmental Protection Assn. v. City of San Juan Capistrano* (2004) 120 Cal.App.4th 961, 968 ["it is plain that voter-sponsored initiatives are not subject to the procedural requirements that might be imposed on statutes or ordinances proposed and adopted by a legislative body, regardless of the substantive law that might be involved"].) More importantly, the meet-and-confer requirements of the MMBA by its express terms constrains only *proposals* by the *"governing body"* (§§ 3504.5, subd. (a) ["the governing body . . . shall give reasonable written notice . . . of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body"] & 3505 ["[t]he governing body . . . shall meet and confer . . . prior to arriving at a determination of policy or course of action].) Because a citizen-sponsored initiative does not involve a proposal *by* the "governing body," we are convinced there are no analogous meet-and-confer requirements for citizen-sponsored initiatives.[27]

---

[27]    Indeed, we are convinced that imposing a "meet-and-confer" obligation on a city before it can place a citizen-sponsored initiative on the ballot would also be inconsistent with the "the rule under the MMBA 'that a public agency is bound to so "meet and confer" *only* in respect to "*any agreement that the public agency is authorized* [by law] *to make . . . .*" [Citation.]' [Citation.] As a practical matter, it would be inappropriate to attribute to the Legislature a purpose of requiring the County to make very substantial negotiating expenditures on subjects over which the County has no authority to act.

*PERB's Contrary Analysis Is Unpersuasive*

The PERB decision ostensibly "decline[d] to decide" the "significant and difficult questions about the applicability of the MMBA's meet-and-confer requirement to a pure citizens' initiative," which it appeared to deem unnecessary because it concluded the CPRI was not a "pure" citizen-sponsored initiative because of Sanders's involvement in promoting the CPRI. However, PERB nevertheless appeared to conclude the citizen's initiative rights enshrined in article II, section 11, and article XI, section 3, subdivision (b), of the California Constitution would *not* obviate the meet-and-confer obligations imposed on City by the MMBA.[28] In this writ proceeding, PERB and Unions appear to

---

Nothing in the statutory language calls for this result. As in other areas of the law, the MMBA is not to be construed to require meaningless acts." (*American Federation of State, etc. Employees v. County of San Diego* (1992) 11 Cal.App.4th 506, 517.) Because a governing body lacks authority to make any changes to a duly qualified citizen's initiative (Elec. Code, § 9032), and instead must simply place it on the ballot without change (*Save Stanislaus Area Farm Economy v. Board of Supervisors, supra,* 13 Cal.App.4th at pp. 148-149), imposing a meet-and-confer obligation on the governing body before it could place a duly qualified citizen's initiative on the ballot would require an idle act by the governing body.

28      Specifically, PERB's decision reasoned (1) the local electorate's right to legislate directly is generally co-extensive with the legislative power of the local governing body, (2) the constitutional right of a local electorate to legislate by initiative extends only to *municipal affairs* and (as such) is preempted by general laws affecting matters of statewide concern, and (3) "[l]egislation establishing a uniform system of fair labor practices, including the collective bargaining process between local government agencies and employee organizations representing public employees, is 'an area of statewide concern that justifies . . . restriction' on the local electorate's power to legislate through the initiative or referendum process" (quoting and relying on *Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 780 (*Voters*)). These authorities apparently led PERB to conclude that "[w]here local control implicates matters of statewide concern" and the two competing interests cannot be harmonized,

35

resurrect this argument, asserting the PERB decision does no violence to the citizen's initiative process. Specifically, they note the Legislature *can* limit (or entirely preempt) the local initiative power on matters of statewide (as opposed to purely local) concern, and contend that because the Supreme Court in *Voters* concluded a local referendum could not be used to reverse the adoption of a memorandum of understanding (MOU) following negotiations pursuant to the MMBA because allowing such use of the referendum would harm the statewide interest underlying the MMBA, the same conclusion applies equally to the initiative process. Accordingly, PERB and Unions argue that when the electorate seeks to exercise control over matters (such as pension benefits) that would be negotiable subjects under the MMBA, the constitutional right of initiative must yield to the statewide objectives of the MMBA, including the procedural requirements of the MMBA imposing a meet-and-confer process before proposals impacting negotiable subjects may be adopted.[29]

---

"the constitutional right of local initiative is preempted by the general laws affecting statewide concerns."

[29]     PERB's decision did recognize that at least one recent Supreme Court case (*Tuolumne Jobs & Small Business Alliance v. Superior Court, supra*, 59 Cal.4th 1029) concluded certain procedural prerequisites under CEQA that *would* apply before a governing body may make a discretionary determination do *not* apply to adoption of initiatives seeking to enact that same determination. Moreover, PERB acknowledges numerous other courts have reached the same conclusion as to other procedural prerequisites. (See, e.g., *Associated Home Builders, Inc. v. City of Livermore, supra,* 18 Cal.3d at p. 594 [holding that state law, which required any ordinance changing zoning or imposing specified land use restrictions can be enacted only after noticed hearing before the city's planning commission and legislative body, does not apply to initiative enacting same type of ordinance]; *Building Industry Assn. v. City of Camarillo, supra,* 41 Cal.3d at pp. 823-824 [procedural requirements of § 65863.6, which must be met before local

We believe PERB and Unions misconstrue, and hence overstate, the import of *Voters*. The *Voters* court addressed a distinct and limited issue: whether voters in a county were entitled to mount a *referendum* challenge to a county ordinance (which adopted an MOU impacting county employee pension benefits) under the relevant constitutional and statutory provisions. The court first concluded that article XI, section 1, subdivision (b), of the California Constitution neither authorized nor restricted voters from challenging the county ordinance by referendum. (*Voters*, *supra*, 8 Cal.4th at pp. 770-776.) The court, after recognizing courts should apply a liberal construction to the initiative power, with any reasonable doubt resolved in favor of preserving it, opined that "we will presume, *absent a clear showing of the Legislature's intent to the contrary*, that legislative decisions of a city council or board of supervisors—including local employee compensation decisions [citation]—are subject to initiative and referendum. *In this case, the legislative intent to bar the referendum power over the ordinance in question is unmistakable*." (*Id*. at p. 777, italics added.) Specifically, *Voters* determined the Legislature, by its enactment of section 25123, subdivision (e), evinced an unmistakable legislative intent to bar challenges *by referendum* to county ordinances

agency adopts no-growth ordinance, inapplicable to citizen's initiative adopting no-growth ordinance]; *Dwyer v. City Council of Berkeley* (1927) 200 Cal. 505; *DeVita v. County of Napa, supra,* 9 Cal.4th at p. 785 ["the existence of procedural requirements for the adoptions of local ordinances generally does not imply a restriction of the power of [a citizen-sponsored] initiative"].) However, PERB peremptorily concluded (and argues here) the MMBA's meet-and-confer procedure is somehow "qualitatively different" from these other provisions, and thus exempted from the type of procedural rules that ordinarily do not apply to initiatives.

specifically related to the adoption or implementation of MOU's. (*Voters,* at pp. 777-778.)[30] The *Voters* court then rejected the petitioner's claim that section 25123, subdivision (e), was unconstitutional, reasoning the Legislature may properly restrict the right of referendum "if this is done as part of the exercise of its plenary power to legislate in matters of statewide concern," and concluded it was required to uphold section 25123, subdivision (e)'s constitutionality if its referendum restriction, which was effectively an "implied delegation of exclusive decisionmaking authority to the boards of supervisors to adopt and implement memoranda of understanding between counties and their employee

---

[30] The court explained the legislative procedures for county referenda are set forth in the Elections Code. Those statutes provide that all county ordinances, with certain enumerated exceptions, "shall become effective 30 days from and after the date of final passage" by the board of supervisors (Elec. Code, § 9141, subd. (b)), and Elections Code section 9144 provides that between the date of the adoption of the ordinance and the date the ordinance becomes finally effective 30 days later, a petition signed by the requisite number of voters will suspend the ordinance and compel the board of supervisors to reconsider it. If the board of supervisors fails to "entirely repeal" the ordinance, it must be submitted to a countywide referendum. (*Id*., § 9145.) However, Elections Code section 9141 *excepts* certain types of county ordinances from the 30-day effective date rule, providing instead that these ordinances go into effect immediately, including ordinances "specifically required by law to take immediate effect." (*Id*., subd. (a)(2).) These provisions, when read together, "make[] clear that when the Legislature desired to denominate certain types of ordinances that were not subject to county referendum procedures, it did so not by specifically declaring these ordinances ineligible for referendum, but rather by providing that they go into effect immediately." (*Voters*, *supra*, 8 Cal.4th at p. 777.) The court then noted section 25123 (which parallels Elec. Code, § 9141 et seq. in providing all county ordinances shall become effective 30 days from final passage except for certain classes of ordinances, which are to go into effect immediately), specifically provides at subdivision (e) that ordinances related to the adoption or implementation of MOU's with employee organizations are to take effect immediately. This statutory scheme convinced the court that, by designating MOU ordinances as a class of ordinances specifically required by law to take effect immediately, the Legislature evinced an unmistakable intent to exempt such ordinances from the referendum procedures. (*Voters*, *supra.*)

associations" (*Voters,* at p. 780), could be construed as fulfilling some legislative purpose of statewide import. The court inferred the legislative purpose of statewide import existed because of the MMBA, which was "a statutory scheme in an area of statewide concern that justifies the referendum restriction inherent in section 25123, subdivision (e)." (*Id.* at pp. 780, 778-784.)

The distinct and limited issue examined in *Voters—whether* the Legislature clearly and unmistakably intended to delimit the electorate's referendum rights and (if so) *whether* that constraint was constitutionally permissible—has no applicable counterpart here. Although *Voters* would support the constitutionality of an enactment by the California Legislature barring citizen initiatives that seek to amend a city charter to limit employee compensation, we are unaware of any statute clearly and unmistakably barring such citizen initiatives[31] (nor have PERB or Unions identified any such bar) and "we will presume, absent a clear showing of the Legislature's intent to the contrary, that . . . local employee compensation decisions [citation] . . . are subject to initiative and referendum." (*Voters, supra,* 8 Cal.4th at p. 777.) The courts have repeatedly upheld the ability of the electorate of a charter city to legislate on compensation issues by initiative (see, e.g., *Spencer v. City of Alhambra* (1941) 44 Cal.App.2d 75, 77-79; *Kugler v. Yocum* (1968) 69 Cal.2d 371, 374-377 (*Kugler*)), and the *Voters* court specifically declined to extend its holding to overrule another decision, *United Public Employees v. City and*

_____

[31]    Indeed, the *Voters* court noted the statute it was considering "is applicable to counties only and has no counterpart for cities," and hence cautioned that "[w]e do not decide whether *city* ordinances that adopt or implement memorandums of understanding pursuant to the MMBA are subject to referendum." (8 Cal.4th at p. 784, fn. 6.)

39

*County of San Francisco* (1987) 190 Cal.App.3d 419, which concluded a charter provision requiring that all increases in employee benefits be subject to voter approval by referendum was compatible with the MMBA. (*Voters,* at pp. 781-782 & fn. 4.)

Thus, contrary to PERB and Union's arguments, *Voters* does not support the conclusion that the MMBA preempts, or superimposes procedural restrictions on, the right of citizens to invoke the initiative process to legislate on compensation issues for the employees of a charter city.

*Conclusion*

We conclude, in light of the language of the MMBA and the "clear distinction between voter-sponsored and city-council-generated initiatives" (*Friends of Sierra Madre, supra,* 25 Cal.4th at p. 189), a city has no obligation under the MMBA to meet and confer before placing a duly qualified citizen-sponsored initiative on the ballot because such an initiative does not involve a proposal by the "governing body" nor could produce an agreement regarding such an initiative that the public agency is authorized to make.

C.    PERB's Determination That City Was Obligated by the MMBA to Meet and Confer Before Placing the CPRI on the Ballot Is Erroneous

PERB concluded City owed, but failed to discharge, the meet-and-confer obligations imposed by the MMBA on governing bodies by placing the CPRI on the ballot without first meeting and conferring with unions. We have already concluded, contrary to PERB's apparent opposing conclusion, a governing body has no obligation to

meet and confer before placing a duly qualified citizen-sponsored initiative on the ballot, but does have meet-and-confer obligations before placing on the ballot a proposal adopted by the governing body that falls within the parameters of sections 3504.5 and 3505.[32] We thus turn to the critical question: whether PERB correctly held the CPRI was not a duly qualified citizen-sponsored initiative exempted from the meet-and-confer requirements, but was instead a governing-body-sponsored ballot proposal within the ambit of *Seal Beach* and the meet-and-confer obligations the MMBA imposes on actions that constitute a "determination of policy" (§ 3505) that have been "proposed [for] adopt[ion] by the governing body" (§ 3504.5, subd. (a)) within the meaning of the MMBA.

We begin by noting the evidence was undisputed (and PERB did not conclude to the contrary) the charter amendment embodied in the CPRI was placed on the ballot because it qualified for the ballot under the "citizen initiative" procedures for charter amendments as provided by the first clause of article XI, section 3, subdivision (b), of the California Constitution (which provides that a charter amendment "may be proposed by initiative or by the governing body") and the governing provisions of Elections Code

_____

[32] The parties have brought to our attention the recent decision in *City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, which evaluated whether the City of Palo Alto committed an unfair labor practice when it failed to meet and consult with the unions before placing a ballot proposal on the ballot. We conclude that case provides no guidance here because it involved whether a governing body owed meet-and-consult obligations before it could place a *city council*-sponsored ballot proposal on the ballot (*id.* at p. 1284), and *not* whether a governing body owes meet-and-confer obligations for a *citizen*-sponsored initiative when some city officials and city staff members assisted in drafting and campaigning for the initiative.

41

9200 et seq. We also note there was no evidence, and PERB did not find, that the charter amendment embodied in the CPRI was placed on the ballot because it qualified as a ballot measure sponsored or proposed *by the governing body* of City under the second clause of article XI, section 3, subdivision (b), of the California Constitution.[33] (See generally *Hernandez v. County of Los Angeles* (2008) 167 Cal.App.4th 12, 21 ["Under the California Constitution there are only two methods for proposing an amendment to a city charter: (1) an *initiative* qualified for the ballot through signed voter petitions; or (2) a *ballot measure* sponsored by the governing body of the city," and noting differing standards applicable to each].) Accordingly, we evaluate whether PERB's decision, which appears to rest on the theory that the participation by a few government officials

---

[33]     Finally, we note the record is devoid of any evidence, and PERB did not find, that the Proponents of the CPRI were merely straw men used by the City Council (as governing body for City) to achieve placement of a City Council-sponsored proposal onto the ballot as a ruse to circumvent the concomitant meet-and-confer obligations that would have been required for an *overt* City Council-sponsored ballot proposal. In *San Diego Municipal Employees, supra*, 206 Cal.App.4th 1447, this court noted the unions' UPC's alleged a significant factual claim—that the CPRI was not a true citizen-sponsored initiative but was instead a sham device employed to circumvent the meet-and-confer obligations owed by City under the MMBA (*id.* at p. 1463)—which in turn raised the question of whether "the CPRI (while nominally a citizen initiative) was actually placed on the ballot by City using straw men to avoid its MMBA obligations." (*Id.* at p. 1460.) It was because such activity was *arguably* prohibited by public employment labor law within PERB's initial exclusive jurisdiction (*ibid.*) that led us to conclude it was error to divest PERB of its ability to conduct proceedings on this issue. (*Ibid.*) However, PERB's decision did not sustain this allegation; to the contrary, PERB's decision appeared to reject the Unions' claims that Proponents acted as agents for City in pursuing the CPRI. Accordingly, we have no occasion to address the distinct issue of whether an entity would violate its meet-and-confer obligations if its *governing body* sought to avoid its meet-and-confer obligations by enlisting private citizens to recast a governing-body-sponsored ballot proposal into a citizen-sponsored initiative.

and employees in drafting and campaigning for a citizen-sponsored initiative somehow converted the CPRI from a citizen-sponsored initiative into a governing-body-sponsored ballot proposal, is erroneous under applicable law.

We conclude PERB's determination was error. As a preliminary matter, we believe that, under *Yamaha*, *supra*, 19 Cal.4th 1, we must apply de novo review of PERB's determination, rather than the more deferential standards of review advocated by PERB and Unions, because PERB's determination turned almost entirely upon its application of the interplay among City's charter provisions (and Sanders's powers and responsibilities thereunder), common law principles of agency, and California's constitutional and statutory provisions governing charter amendments, and did not turn upon resolution of material factual disputes (to which the deferential "substantial evidence" standard would apply) or upon PERB's application of legal principles of which PERB's special expertise with the legal and regulatory milieu surrounding the disputed legal principles would warrant deference. Accordingly, we accord no deference to PERB's legal conclusions as to the constitutional or statutory scheme governing initiatives (*Overstreet ex rel. NLRB v. United Brotherhood of Carpenters and Joiners of America, Local Union No. 1506, supra,* 409 F.3d 1199, 1208-1209; *Azusa Land Partners v. Department of Indus. Relations, supra,* 191 Cal.App.4th at p. 14) or to PERB's application of common law principles of agency over which PERB has no specialized

43

expertise warranting deference.[34]  (Cf. *Styrene Information and Research Center v. Office of Environmental Health Hazard Assessment* (2012) 210 Cal.App.4th 1082, 1100 [no deference where agency in question has no particular interpretive advantage over the courts based on some expertise]; *Sanchez v. Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 584-585 [agency denied applicant unemployment benefits based on finding employee lacked "good cause" to leave employment; court reviewed lack of good cause finding de novo as issue of law].)

---

[34]     PERB, citing *Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp.* (2007) 148 Cal.App.4th 937, 965, argues on appeal that because the existence of an agency relationship is a question of fact, we must defer to PERB's determination on appeal as long as it is supported by substantial evidence.  Certainly, the existence of an agency relationship can present a question of fact.  However, when the material facts are undisputed, the question of the existence of a principal-agent relationship is a matter of law for the courts (see, e.g., *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 745), of which PERB has no specialized expertise.  Indeed, because we will conclude the relevant inquiry is *not* whether Sanders was an agent for City (at least in some capacities), but instead whether he was the actual or ostensible agent *for the governing body* when he helped draft and campaign for the CPRI, we will examine whether PERB correctly concluded Sanders's actions can be charged to a governing body under common law principles.  For example, under common law principles, unless a party (the putative principal) has the legal right to control the action of the other person (the putative agent), the former ordinarily cannot be held vicariously liable for the other person's acts on an agency theory.  (See generally *Edwards v. Freeman* (1949) 34 Cal.2d 589, 592 [absent right of control, no true agency and therefore no imputation of wrongdoer's negligence]; *Kaplan,* at p. 746 ["Absent a showing that Coldwell Banker controlled or had the right to control the day-to-day operations of Marsh's office, it was not liable for Marsh's acts or omissions as a real estate broker on a true agency-respondeat superior theory."].)  Thus, even if the appropriate inquiry was under a "substantial evidence" rubric, there is no evidence the City Council had the *right* to control Sanders's actions here, and hence there would be no substantial evidence to support the conclusion Sanders was the agent of the City Council in promulgating and promoting the CPRI.

It is clear that, apart from charter commission proposals (see generally §§ 34451-34458), California recognizes only two avenues by which a proposed city charter amendment may be placed before the electorate: an initiative that qualifies for the ballot through signed voter petitions, or a ballot proposal that qualifies for the ballot because the governing body (here, the City Council) adopts a resolution placing it on the ballot.[35] (*Hernandez v. County of Los Angeles, supra,* 167 Cal.App.4th at p. 21.) Whether PERB correctly concluded meet-and-confer obligations were triggered here rests on whether it properly recast the CPRI from the former into the latter. Because PERB employed several variants of agency theory to reformulate the CPRI from a citizen-sponsored proposal to a City Council-sponsored proposal, we examine PERB's theories seriatim.

*Statutory Agency*

PERB's first theory, which it denominated as a statutory agency theory, focused on the fact that Sanders, both in his capacity as a so-called "strong mayor" and in his role as the lead negotiator for the City Council in labor-related matters,[36] was empowered by the

---

[35] Section 34458 et seq. prescribing the methods for a governing body to place a proposed charter amendment before the voters, only appears to permit "the governing body" to make the proposal and submit it to the voters for approval. (*Id.*, subd. (a).)

[36] Sanders was the City's lead negotiator in collective bargaining with the City's nine represented bargaining units. In this role, Sanders developed proposals for the City's initial bargaining proposals, but the practice was for the Mayor to brief and obtain approval from the City Council on his proposals before he presented them to the Unions. If the negotiations between Sanders and a bargaining unit produced a tentative agreement, however, Council Policy 300-06 still required the agreement be presented to the City Council (or the Civil Service Commission) for determination and adoption. Thus, the ultimate authority to approve a proposal remained with the City Council.

City Charter to recommend "measures and ordinances" that he believed to be "necessary and expedient" (San Diego City Charter, art. XV, § 265(b)(3)), including recommendations encompassed in his "State of the City" address. (*Id*., art. XV, § 265(c).) From these predicates, PERB deemed the activities of Sanders in aiding in the drafting of and campaign for the CPRI (both individually and insofar as additional actions were undertaken by the staff of his mayoral office at his direction) to have been the actions of the City Council because he was the "statutory agent" for the City Council in labor-related matters. Under this theory, PERB appeared to rule that (1) the CPRI was sufficiently interwoven with Sanders's proposal such that the CPRI was as much Sanders's proposal as it was the Proponents' proposal, and (2) Sanders was statutorily empowered to act on behalf of (and to make proposals on labor-related matters for) the City Council in labor-related matters, and therefore the CPRI became a City Council-sponsored (or at least co-sponsored) proposal carrying meet-and-confer obligations within the meaning of *Seal Beach*.[37]

---

[37] PERB also appeared to conclude that, because section 3505 states (in relevant part) that "The governing body of a public agency, . . . or other representatives as may be properly designated by law or by such governing body, shall meet and confer," the Legislature contemplated that, in addition to the governing body of an agency, other designated representatives would make policy decisions on behalf of the agency and that such decisions would trigger meet-and-confer obligations. We reject this reading of the statutory scheme. Section 3504.5, subdivision (a) describes *when* meet-and-confer obligations are triggered (i.e. when there is an "ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body"), and section 3505 describes *how* that process should be accomplished, including *who* (i.e. the "governing body . . . or other representatives as may be properly designated by law or by such governing body") shall participate on behalf of the governing body. The designation in section 3505 of who shall *conduct* the

46

We conclude reliance on this theory was error because it ignores fundamental principles governing the charter amendment process and the conduct of municipal affairs. First, a charter amendment measure only becomes a "proposal" if it qualifies for the ballot under the citizen-sponsored-proposal provisions (for which no meet-and-confer obligation exists) or qualifies for the ballot as a governing-body-sponsored ballot measure (which would trigger meet-and-confer obligations) under section 34458 et seq. PERB's statutory agency theory essentially deemed Sanders's actions to have been those of the City Council, thereby treating the CPRI as a governing-body-sponsored ballot measure, even though the City Charter[38] specifically provides *all* legislative powers of the City are vested in the City Council (San Diego City Charter, art. III, § 11) as City's legislative body (*id*., art. XV, § 270(a)), and provides such legislative power may not be delegated (*id*., art. III, § 11.1) but must be exercised by a majority vote of the elected councilmembers. (*Id*., art III, § 15 & art. XV, § 270(c).) PERB cites no law suggesting

_____

meet-and-confer process does not expand who *owes* the meet-and-confer obligations imposed by section 3405.5.

[38] PERB asserts in this proceeding that, although it introduced portions of the San Diego City Charter to support its statutory agency claim, it is improper for this court to consider the impact of City Charter provisions not introduced below and not presently the subject of a request for judicial notice. However, charter provisions are judicially noticeable materials (cf. *Giles v. Horn* (2002) 100 Cal.App.4th 206, 225, fn. 6), and we are aware of no impediment to judicially noticing those provisions on our own motion (*PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1204, fn. 25), particularly where it is necessary to examine the entirety of a document to construe the effect of individual portions contained therein. (See generally *Dow v. Lassen Irrigation Co.* (2013) 216 Cal.App.4th 766, 780-781.) Accordingly, we will take judicial notice of the provisions of the San Diego City Charter.

Sanders was in fact (or even could have been) statutorily delegated the power to place a City Council-sponsored ballot proposal on the ballot without submitting it to (and obtaining approval from) the City Council (*Kugler, supra,* 69 Cal.2d at p. 375 [legislative power may not be delegated]; *City of Redwood City v. Moore* (1965) 231 Cal.App.2d 563, 575-576, disapproved on other grounds by *Bishop v City of San Jose* (1969) 1 Cal.3d 56, 63, fn. 6 [recognizing "the general principle that the public powers or trusts devolved by law or charter upon a governing body cannot be delegated to others"]), and because there was no evidence suggesting Sanders sought or obtained such approval, PERB erred in concluding Sanders's actions in supporting the CPRI were in fact acts creating a City Council-sponsored ballot proposal. (Cf. *First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 667 [where city charter prescribes procedures for taking binding action, those requirements may not be deemed satisfied by implication from use of procedures different from those specified in charter]; *Dynamic Ind. Co. v. City of Long Beach* (1958) 159 Cal.App.2d 294, 299 ["When the charter provision has not been complied with, the city may not be held liable in quasi contract, and it will not be estopped to deny the validity of the contract"].)

PERB nevertheless argues its agency theory was correct because employers (including governmental entities) can be held liable for unfair labor practices committed by their agent even when the agent's actions were not formally approved by the governing body. PERB also asserts its agency theory is supported by a 2008 opinion by a former City Attorney (the Aguirre Memo) that concluded, if the Mayor "initiate[d] or

48

sponsor[ed]" a voter petition drive to place a measure on the ballot to amend the City Charter provisions related to retirement pensions, City "would have the same meet-and-confer obligations with its unions over a voter-initiative sponsored by the Mayor as with any City proposal implicating wages, hours, or other terms and conditions of employment."

We are unconvinced the Aguirre Memo undermines our analysis, for several reasons. First, a later opinion from the City Attorney rejected the conclusions of the Aguirre Memo, which it described as "overly broad and incomplete in its analysis," and explained why the City Attorney believed the conclusions reached by the Aguirre Memo were unsound.[39] Second, PERB cites nothing to suggest the opinions expressed in the Aguirre Memo are somehow binding on City, much less that such opinions are entitled to any deference by this court. (*Yamaha, supra,* 19 Cal.4th 1, 11 ["an agency's *legal opinion*, however 'expert,' . . . commands a commensurably lesser degree of judicial deference"].) Because the Aguirre Memo reached its conclusions without considering (or even mentioning) the limiting language of section 3404.5, which triggers meet-and-confer obligations only as to "any ordinance, rule, resolution, or regulation . . . *proposed to be adopted by the governing body,*" its conclusion that meet-and-confer obligations

---

[39]     Specifically, the later letter explained the Aguirre Memo had relied on a misapplication of *Inglewood Teachers Assn. v. Public Employment Relations Bd.* (1991) 227 Ca1.App.3d 767 (*Inglewood*), and had been generated in a different context in which "[i]t was contemplated the Mayor's proposal would be submitted to voters as a City Council proposal." The later letter explained the Aguirre Memo did not address whether any meet-and-confer obligation would exist when "there is no evidence . . . that the City Council is proposing the [CPRI], or authorizing the Mayor to propose or sponsor it."

49

exist for a Mayoral-initiated voter petition drive (which appears to have rested on the erroneous assumption that a measure supported by the Mayor is equivalent to a measure proposed to be adopted by the governing body) is unpersuasive.

We are equally unpersuaded that the cases cited by PERB that upheld unfair labor practices claims against governmental entities for conduct by their agents even when the agent's actions were undertaken without approval by the governing body have any relevance here. In the cases relied on by PERB, the agents' unapproved actions involved statements or actions by the agents that are declared to be unfair labor practices without the necessity of any predicate involvement by the governing body. Specifically, the unapproved actions interfered with, restrained, or coerced the employees in violation of section 3506 of the MMBA (see *Public Employees Assn. v. Bd. of Supervisors* (1985) 167 Cal.App.3d 797, 806-807 ["section 3506 is patterned closely after section 8(a)(1) of the NLRA [citation], which provides it is an unfair labor practice for an employer to 'interfere with, restrain, or coerce' employees in the exercise of rights to 'bargain collectively' "]) or in violation of section 3543.5, subdivision (a). However, both of those sections are distinct from section 3504.5, because both of those sections condemn specified conduct as unlawful labor practices, regardless of whether that specified conduct was accompanied by actions of the governing body.[40] In contrast, the unlawful

---

[40]    The PERB decisions cited by PERB and Unions are of a similar ilk. For example, in *County of Riverside* (2010) PERB Decision No. 2119-M [34 PERC ¶ 108], the alleged unlawful labor practice included allegations that the defendant interfered with employee rights because of the unauthorized actions of two county officials, who made separate statements to SEIU representatives (who were attempting to create a bargaining unit for

labor practice condemned by section 3504.5—the failure to meet and confer—is condemned *only* if preceded by specified conduct or actions of the governing body, i.e. when there is an "ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body." Because section 3504.5 requires predicate action by "the governing body" before the meet-and-confer obligations of section 3505 can be triggered, cases addressing statutes that do not contemplate similar predicate action by a governing body have no persuasive value on the issues presented by the present action.

For all of these reasons, we agree with City that PERB erred in applying "statutory agency" principles to find the CPRI was a de facto governing-body-sponsored ballot proposal that could have triggered meet-and-confer obligations within the contemplation of section 3504.5.

*Common Law Agency: Actual Authority*

PERB's second set of theories, which it denominated as a common law agency theory, focused on the common law doctrine of when a principal can be charged with the

---

"TAP" employees) that such employees would get a union when the officials died, retired or the county went out of business, which PERB concluded violated section 3506's proscription against interfering with, restraining, or coercing employees in the exercise of rights to bargain collectively. (*County of Riverside,* at pp. 16-23.) Similarly, in *San Diego Unified School Dist.* (1980) PERB Decision No. 137E [4 PERC ¶ 11115], PERB concluded the unauthorized action of two school board members in placing letters of commendation into the personnel files of nonstriking teachers violated the proscription contained in section 3543.5, subdivision (a), which prohibits a public school employer from imposing or threatening to impose reprisals on employees because of their exercise of rights guaranteed under the Educational Employment Relations Act, section 3540 et seq.

acts of its agent. PERB's articulated rationale for attributing Sanders's support of the CPRI (as putative agent) to the City Council (as putative principal) under "actual authority" principles was that actual authority is the authority a principal either intentionally confers on the agent or "by want of ordinary care" allows the agent to believe himself to possess (Civ. Code, § 2316), and a principal is responsible to third parties for the wrongful acts of an agent in transacting the principal's business regardless of whether the acts were authorized or ratified by the principal. (Civ. Code, §§ 2330, 2338.) Under this theory, PERB noted (1) Sanders had broad authority as Mayor to recommend legislation to the City Council, (2) he pursued pension reform as a goal for his remaining tenure as Mayor and for the announced purpose of improving the City's financial well-being, and (3) the City Council was aware of Sanders's desire for pension reform and of his efforts to implement it through a citizen-sponsored initiative. From these facts, PERB concluded Sanders's actions could be charged to the City Council because:

> "by want of ordinary care, the City Council allowed Sanders to believe that he could pursue a citizens' initiative to alter employee pension benefits, and that no conflict existed between his duties as the City's chief executive officer and spokesperson for collective bargaining and his rights as a private citizen. . . . Sanders acted with actual authority because proposing necessary legislation and negotiating pension benefits with the Unions were within the scope of the Mayor's authority and because the City acquiesced to his public promotion of the initiative, [and] by placing the measure on the ballot, . . . while accepting the considerable financial benefits resulting from the passage and implementation of [the CPRI]." (Fn. omitted.)

52

We conclude PERB's use of a common law agency theory, which PERB appears to have used in order to find Sanders's actions are to be charged to or deemed the acts of the City Council, is erroneous.[41] "Actual" authority is (1) the authority the principal intentionally gives the agent, or (2) the authority the principal intentionally or negligently allows the agent to believe he possesses. (Civ. Code, § 2316.) There is no evidence the City Council *actually* authorized Sanders to act on its behalf to formulate and campaign for the CPRI, nor any evidence Sanders *believed* he was acting or had the authority to act *on behalf of the City Council* when he took those actions.[42]

---

[41] We accord no deference to PERB's legal conclusions because, although PERB certainly evaluates and applies common law principles of agency when making its administrative adjudications (see, e.g., *Chula Vista Elementary School Dist.* (2004) PERB Decision No. 1647E [28 PERC ¶ 184] [applying agency principles to hold school district liable for acts of school principal that constituted unlawful intimidation in violation of § 3543.5]; *Inglewood Unified School Dist.* (1990) PERB Decision 792E [14 PERC ¶ 21057] [concluding ALJ erroneously applied agency principles to hold school district liable for acts of school principal that allegedly constituted unlawful intimidation]), it has no comparative expertise in the common law that would warrant deference by this court (*California State Teachers' Retirement System v. County of Los Angeles, supra,* 216 Cal.App.4th at p. 55), and we therefore accord no deference to PERB's legal analysis of common law principles.

[42] Indeed, PERB appears to have acknowledged it was not relying on any actual authorization when applying the actual agency theory, because it acknowledged that "[u]nder the circumstances, making liability dependent on whether the City Council *expressly* authorized Sanders . . . to pursue a pension reform ballot measure would undermine the principle of bilateral negotiations by exploiting the 'problematic nature of the relationship between the MMBA and the local [initiative-referendum] power.' [(Citing *Voters, supra,* 8 Cal.4th 765, 782.)]" Moreover, when PERB evaluated whether the City Council had " 'intentionally, or by want of ordinary care' " induced Sanders to *believe* he was acting on behalf of the City Council when he took those actions, PERB merely recited that Sanders "believed pension reform was needed to eliminate the City's $73 million structural budget deficit" and could be accomplished by the CPRI and therefore "*believed himself to be acting on behalf of the City*." However, PERB

53

*PERB's "Apparent Agency" Theory*[43]

PERB's decision also relied on common law agency principles of "apparent authority" to support charging the City Council (as putative principal) with the acts of Sanders (as putative agent) in promulgating and supporting the CPRI. PERB's articulated rationale for attributing Sanders's support of the CPRI to the City Council under "apparent" authority principles was that the City Council intentionally or negligently caused or allowed the employees to reasonably believe Sanders was acting on behalf of the City Council in promulgating and supporting the CPRI within the meaning of the apparent authority principles codified in Civil Code section 2317. PERB, although acknowledging that *Inglewood, supra,* 227 Ca1.App.3d 767 required the party asserting an agency relationship by way of apparent authority to satisfy the burden of proving the elements of that theory (*id*. at p. 780) and that "[m]ere surmise as to the authority of an agent is insufficient to impose liability on the principal" (*id*. at p. 782), concluded *Inglewood's* test was satisfied. PERB reasoned that, because employees knew Sanders

erroneously transformed the only "belief" for which there *was* evidentiary support—that Sanders believed his support for the CPRI was in the City's best financial interests—into a finding for which there was *no* evidentiary support: that the City Council somehow induced Sanders to believe his actions in promoting the CPRI were on *behalf of the City Council*. Although the evidence supports the finding that Sanders believed his actions promoted the City's best financial interests, there is no evidentiary support he believed he was promoting the CPRI on behalf of the City Council, and therefore this aspect of PERB's actual agency theory lacks support.

[43] The courts have interchangeably used the nomenclature of "apparent" agency or "ostensible" agency to describe this principle of vicarious liability. (See, e.g., *Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942.) We will refer to it, as did PERB, as "apparent" agency.

54

was an elected official and City's chief executive officer, and knew Sanders touted the CPRI as a measure that was in the best interests of City, employees "would reasonably conclude[] that the City Council had authorized or permitted [Sanders] to pursue his campaign for pension reform to avoid meeting and conferring with employee labor representatives."

We conclude PERB's "apparent agency" rationale is erroneous, for several reasons. First, apparent agency focuses on whether the principal (either intentionally or by want of ordinary care) caused or allowed a third person to believe the agent possessed authority to act on behalf of the principal (Civ. Code, § 2317), and therefore must be established through the conduct *of the principal* and cannot be created merely by a purported agent's conduct or representations.[44] (*Mosesian v. Bagdasarian* (1968) 260 Cal.App.2d 361, 367; *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1132.) Thus, even assuming apparent agency *could* be applied to permit Sanders's actions to somehow "bind" the City Council into being a co-sponsor of the CPRI,[45] PERB's

---

[44]    We also note that "[l]iability of the principal for the acts of an ostensible agent rests on the doctrine of 'estoppel,' the essential elements of which are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury." (*Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752, 761.) PERB's decision does not explain how the third element necessary to application of the common law principle was satisfied, which further undermines the propriety of invoking that doctrine in this case.

[45]    We have substantial doubt an "apparent agency" theory can even be applied here. In *Boren v. State Personnel Bd.* (1951) 37 Cal.2d 634, the court (although noting that "[e]ven in the field of private contracts, the doctrines of ostensible agency or agency by estoppel are not based upon the representations of the agent but upon the representations of the principal" (*id*. at p. 643), rejected a plaintiff's effort to invoke "agency by

55

decision (and PERB's and Unions' briefs on appeal) cite only the actions of Sanders and

his staff as the evidentiary foundation for application of "apparent" agency theory.

Neither PERB's decision nor PERB's and Unions' brief's on appeal cite any evidence that

the putative principal (the City Council) affirmatively did or said anything that could

have caused or allowed a reasonable employee to believe Sanders had been authorized to

act on behalf of the City Council in promoting the CPRI, which undermines PERB's

"apparent" agency theory.[46]

PERB's "apparent" agency theory in the present decision eschewed any reliance on

affirmative manifestations by the City Council affirming Sanders's support for the CPRI

was on its behalf.[47]  Instead, PERB relied solely on the fact that Sanders supported the

estoppel," noting that "[t]o invoke estoppel in cases like the present would have the effect
of granting to the state's agents the power to bind the state merely by representing that
they have the power to do so.  It [has been] held that the authority of a public officer
cannot be expanded by estoppel.  [Citations.]" (*Ibid*.)  We need not decide that issue here
because, even assuming it could apply, there appears to be no evidentiary support for that
theory.

[46]    We recognize that apparent agency can be premised on inaction by the principal
because "where the principal knows that the agent holds himself out as clothed with
certain authority, and remains silent, such conduct on the part of the principal may give
rise to liability." (*Preis v. American Indemnity Co., supra,* 220 Cal.App.3d at p. 761.)
However, even assuming this theory can apply here (but see fn. 45, *ante*), PERB
recognized that Sanders repeatedly stated his efforts in promoting the CPRI were in his
capacity as a private citizen, and there is no evidence Sanders ever claimed his efforts
were as the City Council's representative, which renders the City Council's inaction or
silence incapable of supporting an "apparent" authority finding.

[47]    PERB's prior decisions have appeared to acknowledge that " 'apparent authority to
act on behalf of the employer may be found where *the manifestations of the employer*
create a reasonable basis for employees to believe that the employer has authorized the
alleged agent to perform the act in question' " (*Trustees of the California State University*

CPRI while occupying an office the responsibilities of which included acting for the City Council as the labor relations point man and recommending measures on labor issues to the City Council, and based thereon concluded Sanders had apparent or actual discretionary authority to promote the CPRI on behalf of the City Council, and therefore the City Council can be charged with liability for Sanders's failure to meet and confer over the CPRI. We recognize that "apparent" agency, like a respondeat superior theory (see *Inglewood, supra,* 227 Cal.App.3d at p. 779 [noting courts do not always distinguish between ostensible agency theory and tort doctrine of respondeat superior]), permits a third party to hold a principal liable for the wrongful conduct of his agent within the scope of his authority even where the agent was not operating with the express authorization of his principal when engaging in that conduct. (See generally *Saks v. Charity Mission Baptist Church* (2001) 90 Cal.App.4th 1116, 1137-1139; *J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 403 [noting ostensible agency principles can be used to hold principal vicariously liable for agent's acts].)[48] In the field

_____

(2014) PERB Decision No. 2384-H, p. 39, quoting *West Contra Costa County Healthcare District* (2011) PERB Dec. No. 2164-M, p. 7, italics added by *Trustees*), but PERB's decision here cites no such conduct by the City Council.

[48] Many PERB decisions have also held that an employer's officials, particularly those whose duties include employee or labor relations or collective bargaining matters, have been presumed to have acted on behalf of the employer such that their commission of acts constituting unfair labor practices were imputed to the employer. (*San Diego Unified School Dist., supra,* PERB Decision No. 137-E [unauthorized action of two school board members in placing letters of commendation into the personnel files of nonstriking teachers violated the proscription violated "no reprisal" rule of § 3543.5, subd. (a)]; *Trustees of the California State University, supra,* PERB Decision No. 2384-H.)

of labor relations, some cases decided under the Agricultural Labor Relations Act (ALRA) have upheld imposing liability on an employer for an act by an agent that constituted an unfair labor practice, even when such act was not expressly authorized by the employer, as long as such act was within the scope of the agent's duties.[49] (See *Vista*

---

[49] PERB's brief in this writ proceeding also asserts it was appropriate for the PERB decision to charge the City Council with Sanders's actions because he "acted within the scope of his authority as lead labor negotiator" in supporting the CPRI, which can be sufficient under NLRA precedent (see *H. J. Heinz Co. v. NLRB* (1941) 311 U.S. 514, 520-521; *International Assn. of Machinists v. NLRB* (1940) 311 U.S. 72, 80) to charge an employer with the wrongful conduct of its supervisory personnel. However, the court in *Inglewood* recognized NLRA precedent is of limited value in the Education Employment Relations Act (EERA) arena because "there are significant differences between the two statutes" and "at times, PERB has even stated that not only is NLRA precedent not controlling, it may not even be instructive." (*Inglewood, supra*, 227 Cal.App.3d at p. 777.) We note that, under the NLRA, an employer is specifically defined to include "any person acting as an agent of an employer, directly or indirectly" (29 U.S.C. § 152(2)), and explicitly states that "[i]n determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." (29 U.S.C. § 152(13).) In light of that statutory scheme, the *Heinz* court explained "[t]he question is not one of legal liability of the employer in damages or for penalties on principles of agency or *respondeat superior*, but only whether the [NLRA] condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes." (*Heinz,* at p. 521.) Although NLRA precedent can be relevant in some circumstances (see, e.g., *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 272), it is too distinct from the issue presented here: whether the MMBA was designed to permit the governing body to be charged with the unapproved conduct of its agents (cf. *Inglewood,* at p. 778 [rejecting union argument that agent should be included in definition of employer under EERA, because "[s]ince the Legislature is deemed to be aware of the content of its own statutory enactments, it is a reasonable inference that the Legislature would have included the term agent in the definition of employer under the EERA if it wanted school districts perpetually exposed to liability for any unfair labor practice committed by an agent of a school district"]), particularly when the specific conduct—compliance with the meet-and-confer mandate of section 3504.5—is triggered only when there is some action "proposed

58

*Verde Farms v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307; *Superior Farming Co. v. Agricultural Labor Relations Bd.* (1984) 151 Cal.App.3d 100.) However, decisions under the ALRA provide little guidance because "under the ALRA, application of the NLRA standard is statutorily mandated" (*Inglewood, supra*, 227 Cal.App.3d at p. 778), and those standards are not premised on common law principles (*id.* at pp. 776-777; accord, *Superior Farming Co.,* at p. 118 ["employer responsibility for acts of agents or quasi-agents . . . is not governed by common law agency principles"]; see also fn. 49, *ante*), nor have PERB or Unions demonstrated there are sufficient parallels between the relevant provisions of the MMBA and the ALRA to permit cases decided under the latter scheme to provide persuasive guidance under the distinct scheme of the MMBA.

More importantly, affixing vicarious liability upon a principal under common law agency principles, regardless of whether the principal authorized the explicit conduct at issue, appears to presuppose the agent committed a wrongful act ab initio. (Cf. *Bayuk v. Edson* (1965) 236 Cal.App.2d 309, 320.) This theory may well justify charging a principal with liability for an agent's acts that are inherently wrongful and injurious, such as the act committed by the agent in *Vista Verde Farms v. Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d at pp. 317-318 (in which the court noted the agent's acts violated Lab. Code, § 1153 and "would unquestionably constitute an unfair labor practice [citation] if engaged in directly by the employer"), regardless of whether the principal

to be adopted by the governing body" (§ 3504.5, subd. (a)) rather than some action proposed by a putative agent of the governing body.

authorized those acts. However, the acts alleged here—an individual's advocacy for a citizen-sponsored initiative effecting employee benefits—is not an inherently wrongful act,[50] nor are we persuaded the MMBA explicitly proscribes such conduct merely because that individual occupies public office. Instead, the MMBA only requires compliance with the meet-and-confer mandate of section 3504.5 when there is some action "proposed to be adopted by the governing body" (*id.*, subd. (a)), and has no apparent applicability when the "governing body" is not affirmatively involved with the proposal.

We conclude PERB's reliance on common law principles of "apparent" agency or respondeat superior, in order to charge the City Council (as putative principal) with the acts of Sanders (as putative agent) in promulgating and supporting the CPRI despite the

---

[50] To the contrary, Sanders's advocacy for the CPRI is not inherently wrongful, but is instead protected under both statutory law (see §§ 3203 ["[e]xcept as otherwise provided in this chapter, or as necessary to meet requirements of federal law as it pertains to a particular employee or employees, no restriction shall be placed on the political activities of any officer or employee of a state or local agency"] and 3209 ["[n]othing in this chapter prevents an officer . . . of a state or local agency from soliciting or receiving political funds or contributions to promote the passage or defeat of a ballot measure which would affect the rate of pay, hours of work, retirement, civil service, or other working conditions of officers or employees of such state or local agency, except that a state or local agency may prohibit or limit such activities by its employees during their working hours"]) and under the Constitution. (See generally *Wood v. Georgia* (1962) 370 U.S. 375, 394 ["petitioner was an elected official and had the right to enter the field of political controversy"]; *Bond v. Floyd* (1966) 385 U.S. 116, 136-137.) Accordingly, common law principles of "apparent" agency or respondeat superior, which permit a third party to hold a principal liable for the *wrongful* acts of his agent, have no application here.

absence of any evidence the City Council actually authorized these acts, is without legal support and was erroneous.

*PERB's "Ratification" Theory*

PERB's decision also relied on common law principles of "ratification" to support charging the City Council (as putative principal) with the acts of Sanders (as putative agent) in promulgating and supporting the CPRI. As articulated by PERB, the City Council adopted Sanders's actions in promulgating and supporting the CPRI as their own measure because:

> "An agency relationship may also be established by adoption or subsequent ratification of the acts of another. (Civ. Code, §§ 2307, 2310.) It is well established as a principal of labor law that where a party ratifies the conduct of another, the party adopting such conduct also accepts responsibility for any unfair practices implicated by that conduct. [Citing *Compton Unified School District* (2003) PERB Decision No. 1518-E at p. 5 and *Dowd v. International Longshoremen's Assn., AFL-CIO* (11th Cir. 1992) 975 F.2d 779, 785-786.] Thus, ratification may impose liability for the acts of employees or representatives, even when the principal is not at fault and takes no active part in those acts. [Citation.] Ratification may be express or implied, and an implied ratification may be found if an employer fails to investigate or respond to allegations of wrongdoing by its employee."

PERB's decision, noting it was adequately shown the City Council had actual or constructive knowledge of Sanders's actions in support of the CPRI, relied on two grounds for applying "ratification" to convert Sanders's support for the citizen-sponsored CPRI initiative into City Council support for that initiative: the City Council's inaction (because it was aware of Sanders's support but did not disavow or repudiate his conduct), and the City Council's actions in placing the CPRI on the ballot while rejecting Unions'

61

"meet-and-confer" demands and accepting the financial benefits accruing from its passage. We conclude none of these grounds support PERB's determination that the City Council can be deemed to have promulgated or supported the CPRI under ratification principles.[51]

The first basis for PERB's ratification theory appears to be that the City Council did not disavow or repudiate his conduct. Although the failure to repudiate otherwise wrongful conduct can warrant charging a putative principal with responsibility for any unfair practices implicated by that conduct, as was the case in *Compton Unified School District, supra,* PERB Decision No. 1518E [27 PERC ¶ 56] and *Dowd v. International Longshoremen Assn., AFL-CI0, supra,* 975 F.2d 779, this presupposes the issue to be

_____

[51]    We note that, in this writ proceeding, PERB's brief appears to focus almost exclusively on the foundational issue—whether there was substantial evidence the City Council was aware of Sanders's conduct and "failed to disavow it"—with almost no discussion of whether (in light of that knowledge) the City Council's inaction (failure to disavow), or action (placing the CPRI on the ballot and rejecting Unions' "meet-and-confer" demands), or acceptance of the financial benefits supports the legal conclusion that the City Council adopted Sanders's support for the citizen-sponsored CPRI as its own under ratification principles. Similarly, the Unions' brief is largely silent on this issue, arguing only that (by failing to meet and confer over the CPRI) "the City Council ratified [Sanders's] unlawful scheme . . . ." This argument—that the City Council's *lawful* rejection of Unions' meet-and-confer demands (based on our conclusion there are no meet-and-confer obligations on citizen-sponsored initiatives, see part III.B., *ante*) converted such conduct into an *unlawful* rejection of those meet-and-confer demands under ratification principles—amounts to a *petitio principii* argument (*Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 1005) and sheds no light on the propriety of PERB's conclusion. While this lacuna would permit us to deem this claim abandoned (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 ["[w]hen an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary"]), we nevertheless examine PERB's stated basis for its "ratification" theory.

determined: whether Sanders's conduct *was* an unfair labor practice. (See fn. 50, *ante*.) We are aware of no law holding that an elected official's support (however vigorous) for a citizen-sponsored ballot measure impacting a subject otherwise negotiable under the MMBA violates the meet-and-confer provisions (or any other provision) of the MMBA, and we are convinced Sanders was entitled to support the CPRI (either as an individual or through capitalizing on his office's bully pulpit) because he was not supporting the proposal as the "governing body," which is the only entity constrained by the meet-and-confer obligations under the MMBA.

Moreover, reliance on the City Council's inaction is incompatible with other common law principles of ratification, which recognize that " 'ratification can be made only in the manner that would have been necessary to confer an original authority for the act ratified . . . .' (Civ. Code, § 2310.) Thus, where the equal dignities rule applies, it requires formal, written ratification." (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571; accord, *John Paul Lumber Co. v. Agnew* (1954) 125 Cal.App.2d 613, 622 [corporation's ratification of alleged agent's unauthorized sale of its property can only be effected through a resolution of its board of directors when duly assembled].) Accordingly, absent a majority vote of the elected councilmembers (City Charter, art. III, § 15 & art. XV, § 270(c)), it is improper to find that Sanders's support for a citizen-sponsored initiative could convert the CPRI into a City Council-sponsored ballot proposal under ratification principles. (*Kugler, supra,* 69 Cal.2d at p. 375; *First Street Plaza Partners v. City of Los Angeles, supra,* 65 Cal.App.4th at p. 667 [where city charter

63

prescribes procedures for taking binding action, those requirements may not be satisfied by implication from use of procedures different from those specified in charter]; cf. *Stowe v. Maxey* (1927) 84 Cal.App. 532, 547-549 [declining to apply ratification principles to validate act where act was one county board was incapable of delegating].)

Finally, insofar as PERB premised ratification on the City Council's placing the CPRI on the ballot, and the City Council's acceptance of the financial benefits accruing from its passage by the voters, we conclude that theory also lacks legal foundation. This aspect of PERB's legal analysis rests on the unstated predicate that the City Council could have declined to place the CPRI on the ballot or to accept the financial benefits accruing from its passage, and that its decision to act to the contrary adopted Sanders's otherwise unauthorized conduct by ratification. However, ratification has no application when the principal is unable to decline the benefits of an agent's unauthorized actions. (See generally *Pacific Bone, Coal & Fertilizer Co. v. Bleakmore* (1927) 81 Cal.App. 659, 664-665.) The City Council was required by the Elections Code to place the CPRI before the voters (without alteration) because it qualified for the ballot (cf. *Blotter v. Farrell* (1954) 42 Cal.2d 804, 812-813), and PERB cites no authority suggesting the City Council could have elected to ignore the mandates of the CPRI (by refusing to accept the financial benefits accruing from its passage) once the CPRI was approved by the voters. Accordingly, the fact the City Council complied with its legal obligations cannot support PERB's ratification theory.

64

D.     Conclusion

We conclude, for the reasons previously explained, a city has no obligation under the MMBA to meet and confer before placing a duly qualified citizen-sponsored initiative on the ballot, and only owes such obligations before placing a governing-body-sponsored ballot proposal on the ballot. We further conclude PERB's fundamental premise—that under agency principles Sanders's support for the CPRI converted it from a citizen-sponsored initiative on which no meet-and-confer obligations were imposed into a City Council-sponsored ballot proposal to which section 3504.5's meet-and-confer obligations became applicable—is legally erroneous. Because PERB's remaining determinations— that the City Council engaged in an unfair labor practice when it defaulted on its obligations under section 3504.5 and that PERB's "make whole" remedies for that alleged unfair labor practice could order City to de facto refuse to comply with the CPRI— proceeded from this fundamental but legally erroneous premise, PERB's decision must be annulled and remanded for further proceedings consistent with the views expressed in this opinion. (*San Mateo City School Dist. v. Public Employment Relations Bd., supra,* 33 Cal.3d at p. 867.)

DISPOSITION

The Public Employment Relations Board (PERB) decision is annulled, and the matter is remanded to PERB with directions to dismiss the complaints and to order any other appropriate relief consistent with the views expressed within this opinion. Each party shall bear its own costs of this proceeding.

65

                                        McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


NARES, J.